**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| BONNIE LOU BOWERS, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 19-17386 |
| | : | |
| v. | : | |
| | : | **OPINION** |
| ANDREW SAUL, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**WOLFSON, Chief Judge:**

Bonnie Lou Bowers ("Plaintiff"), appeals from the final decision of the Commissioner of Social Security, Andrew Saul ("Defendant"), denying Plaintiff disability benefits under Tile II of the Social Security Act. After reviewing the Administrative Record, the Court will vacate and remand the case for reconsideration because the Administrative Law Judge ("ALJ") failed to properly explain the weight she assigned to the testimony of Dr. Karen Tennyson, Mary Terp, and Amanda Mitchell.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff was born on January 3, 1956, and operated a business designing custom drapery, bridal gowns, and costumes until 2005, when Plaintiff merged her business with her husband's kitchen design company, and they developed a high-end interior design business. Administrative Record ("A.R.") 54-55. In 2007, Plaintiff began training to become the administrator of the joint company. A.R. 58. However, the business sharply declined as result of the 2008 recession, and Plaintiff stopped taking a salary to help keep the business in operation. A.R. 57-59. Around that

time, Plaintiff began experiencing memory difficulties that affected her work performance. A.R. 61. However, Plaintiff continued performing the roles of controller and human resources manager, albeit with some difficulty, until the business closed in 2014. A.R. 60.

Plaintiff's date last insured, the latest date that she was eligible to apply for disability insurance benefits, expired on December 31, 2013. A.R. 19. However, Plaintiff filed a Title II application for disability benefits on November 17, 2015, after being diagnosed with dementia. A.R. 17. Plaintiff's claim was initially denied on April 4, 2016, due to a lack of evidence that Plaintiff had become disabled by December 31, 2013, the date last insured. *Id*. Upon reconsideration, Plaintiff's claim was again denied on June 28, 2016. *Id*. Thereafter, Plaintiff filed a request for a hearing, which occurred on April 13, 2018, before Administrative Law Judge Jennifer Spector. *Id*. The ALJ's Decision, rendered on June 27, 2018, determined that the onset of Plaintiff's disability occurred on June 15, 2009. *Id*. Nevertheless, the ALJ found that Plaintiff remained capable of substantial gainful activity through December 31, 2013, and therefore was not disabled by the date last insured. A.R. 31. On August 27, 2018, Plaintiff submitted a request for a review of the ALJ's Decision by the Appeals Council, which was denied. ECF No. 12, Plaintiff's Brief ("Pl. Br.") at 1. Afterwards, on August 30, 2019, Plaintiff filed the instant appeal. *Id*.

### A.  Review of the Medical Evidence

Although Plaintiff had begun experiencing symptoms of Early-Onset Alzheimer's Disease by June 15, 2009, Plaintiff was first screened for mental impairment in April 2015, as part of her and her husband's application to become a resource family for foster parents. A.R. 313. Dr. Ira Liebross, Plaintiff's primary care physician, identified mildly impaired short-term memory and

2

noted that Plaintiff complained of fatigue and difficulty focusing. A.R. 298. Dr. Liebross referred Plaintiff to a neurologist. A.R. 319.

Plaintiff attended a neurology consultation with Dr. Dipak Pandya in May 2015. A.R. 319. Plaintiff indicated that her symptoms were mild to moderate, but that they had worsened over the prior three months. *Id*. Plaintiff's memory and concentration abilities were recorded as normal, but Plaintiff did not know the date and received a score of less than 17 on a Mini-Mental Status Examination, indicating cognitive impairment. A.R. 322. Dr. Pandya believed that Plaintiff's testing was negatively affected by her highly emotional state. *Id*. Dr. Pandya diagnosed Plaintiff with an anxiety disorder, depression, and mild cognitive impairment with memory loss. A.R. 318. At a follow-up appointment with Dr. Pandya in September 2015, Plaintiff reported that her symptoms were mild but waxed and waned between days. A.R. 316. Plaintiff stated that her symptoms had not affected her activities of daily living. *Id*. During that consultation, Plaintiff showed normal attention and concentration and performed well on memory testing. A.R. 318. However, a brain MRI showed mild non-specific white matter changes and mild atrophy, and Dr. Pandya recommended neurocognitive and psychiatric evaluations. A.R. 316.

Neuropsychologist Dr. Karen Tennyson evaluated Plaintiff in September and October of 2015. A.R. 331, 341. Dr. Tennyson recorded that Plaintiff remained independent with activities of daily living and could drive short distances and pay bills. A.R. 333. However, during observation, Plaintiff could not accurately state the day, the day of the week, the name of the governor, or the town she was in. *Id*. Plaintiff had difficulty drawing a clock and became tearful. *Id*. She had adequate receptive language but struggled to comprehend directions for more complex tasks. *Id*. Dr. Tennyson estimated that Plaintiff's premorbid abilities had likely been average, but Plaintiff's Full Scale IQ had dropped into the extremely low range. A.R. 334. Plaintiff's processing speed

3

was below expectation, and her verbal attention and working memory were far below expectation. A.R. 334-35. In addition, Plaintiff's visual motor construction and visual memory retrieval were impaired. A.R. 335. Dr. Tennyson concluded that Plaintiff showed severe memory deficits with cognitive defects, and diagnosed Plaintiff with dementia, not otherwise specified, and an adjustment reaction with mixed emotional features. A.R. 341. Dr. Tennyson noted that there appeared to have been a progressive decline in Plaintiff's abilities beginning as early as 2007 to 2009, but that neither Plaintiff nor her husband were good historians in recording the course of her symptoms. A.R. 337.

In March 2016, state psychological consultant Dr. Luis Umpierre reviewed Plaintiff's disability benefits claim. A.R. 97. Dr. Umpierre concluded that there was insufficient medical evidence to determine Plaintiff's functioning or level of impairment prior to her last insured date of December 31, 2013. A.R. 100. Upon reevaluation of Plaintiff's claim in June 2016, state psychological consultant Dr. Pamela Foley noted no additional relevant medical evidence to consider. A.R. 109.

Plaintiff consulted with geriatric specialist Dr. John Waters in December 2016. A.R. 273. Dr. Waters recorded that Plaintiff could still perform activities of daily living and drive locally, but that she was unable to manage money independently. A.R. 276. At this consultation, Plaintiff could not remember where she went to college or an emergency room visit for a dog bite two months prior. *Id*. Plaintiff scored 11/30 on the Montreal Cognitive Assessment Tool, consistent with cognitive impairment. A.R. 275-76. Also, Plaintiff scored 14/30 on the Geriatric Depression Scale, indicating mild depression. A.R. 276. Dr. Waters determined that Early-Onset Alzheimer's Type Dementia was a likely diagnosis consistent with Plaintiff's previous neuropsychological testing. A.R. 278.

4

### B.  Review of Testimonial Record

Plaintiff's husband, David Peer ("Peer"), appeared and testified at a hearing before the ALJ on April 13, 2018. A.R. 51. Peer testified that Plaintiff began exhibiting poor judgment regarding their finances and residence as early as 2000, and that Plaintiff first showed symptoms of depression in 2005 or 2006, but he attributed these changes to their intense lifestyle at the time. A.R. 71-72. He further testified that Plaintiff intended to become the administrator of their joint company in 2007, but that the business declined due to the economic crash of 2008. A.R. 58-59. Peer testified that he and Plaintiff stopped taking a salary from the business in 2008 to save cash, but that Plaintiff continued working until the business closed in 2014. A.R. 59.

Due to the loss of other employees, Plaintiff began to progressively take on the duties of the controller and personnel manager. A.R. 60. These positions involved performing employment, sales tax, and insurance audits, and Peer stated that Plaintiff would work between 20 and 80 hours per week, sometimes until 1:00 A.M., depending on the audit schedule. A.R. 60, 68-69. However, Peer testified that Plaintiff struggled to acquire and retain the knowledge necessary to conduct these audits. A.R. 62. Other employees told Peer that Plaintiff could not comprehend and remember critical issues, and that Plaintiff would ask multiple times about the same information. A.R. 68. However, Peer believed that Plaintiff was simply affected by stress or not adequately trained to perform her duties. A.R. 61-62.

Peer testified that Plaintiff also began having difficulty with tasks at home during this time period. A.R. 63. Peer reported that their children became uncomfortable with Plaintiff's driving due to her worsening reaction time. A.R. 64. He further testified that Plaintiff began having difficulty with directions and multi-tasking, such as collecting the mail and the garbage at the same time. A.R. 64-65. Peer testified that Plaintiff lost interest in cooking and washing clothes, which

she had always performed capably. A.R. 64, 74. Peer reported that Plaintiff might have been able to follow instructions and work 40 hours a week in a simple job prior to 2014, but he stated that Plaintiff would not have wanted to perform such a job because she had only ever worked in her own businesses. A.R. 73.

The administrative record also includes a "Third Party Function Report" completed by David Peer in March 2016, as part of Plaintiff's application for disability insurance. A.R. 213. Peer stated in the report that Plaintiff remained able to prepare meals and do housework, even though these tasks took longer than before, and the results had become inconsistent. A.R. 213-15. Also, through 2016, Plaintiff could reportedly handle money with oversight and was capable of shopping. A.R. 216. Peer stated that Plaintiff continued to fill her time with projects and gardening, and that she still drove locally despite a doctor's recommendation to stop. A.R. 215-16. However, Peer reported that Plaintiff was unable to retain directives and could only follow one-step instructions. A.R. 218. Plaintiff would need to frequently check in with others to follow even simple directions. *Id.* Plaintiff would overfeed the dogs and lose articles because she could not remember her activities. A.R. 214. Plaintiff reportedly remained social with friends and family, but she had become increasingly aware of her reduced ability to contribute to conversations. A.R. 217.

Mary Terp ("Terp"), who worked with Plaintiff from 2001 to 2009, also testified before the ALJ on April 13, 2018. A.R. 76. Terp worked in human resources, and in 2007, she began to train Plaintiff on hiring, payroll, accounts receivable, and accounts payable. A.R. 77-79. However, Terp testified that the training went "terribly" and that Plaintiff had difficulty grasping the new tasks. A.R. 79. Terp testified that she wrote step by step instructions, but that Plaintiff was unable to proceed if any small change to the process arose. A.R. 80. Terp stated that, by the time she left

the company in January 2009, Plaintiff had still not learned her new tasks, and Terp believed that Plaintiff lacked the cognitive ability to master them. A.R. 81. However, Terp did not want to bluntly tell Peer that his wife was struggling on the job. A.R. 82.

In addition, Terp submitted a witness statement regarding Plaintiff's working capabilities from 2007 to 2009. A.R. 223. Terp stated that Plaintiff's desire to become more involved with the company was a burden on Terp and the other employees, because Plaintiff was not organized in tasks or thought and was not capable of following a process. *Id.* Terp certified that Plaintiff would often display a "vacant expression" and was unable to listen to and understand things being explained to her. *Id.* Towards the end of Terp's employment, Plaintiff would forget information quickly and would neglect to flush the toilet in the office restroom. *Id.*

Amanda Mitchell ("Mitchell"), Plaintiff's friend and paralegal, also submitted a witness statement. A.R. 225. Mitchell certified that she noticed something "wasn't right" with Plaintiff when they first spoke at a dinner party in December 2010. *Id.* Plaintiff reportedly told Mitchell during the party "about 5 times" that she had three boys, which Mitchell already knew. *Id.* Mitchell worked with Plaintiff to stay a Sheriff's sale and vacate a default judgment of foreclosure on a property that Plaintiff owned. *Id.* Mitchell stated that Plaintiff had no recollection of being served with a foreclosure complaint or a subsequent judgment. *Id.* However, Mitchell stated that Plaintiff's bank produced evidence of a receipt of service containing Plaintiff's signature. *Id.* On other occasions, Mitchell certified that Plaintiff would repeat something over the course of an evening as if she was saying it for the first time. A.R. 226. Also, Mitchell stated that on one occasion, a couple years after they met, Plaintiff ate five slices of pizza because she forgot after each slice that she had already eaten. A.R. 225. Mitchell further certified that, on New Year's Eve of 2012, Plaintiff planned to cook an entree for a group, but she completely forgot to do so. A.R.

226. Finally, in June 2013, Plaintiff reportedly asked Mitchell the same question about her son at least five times, and over that summer, Plaintiff reportedly told Mitchell that she had a new swimsuit each time that they met. *Id.*

In addition, Dr. Tennyson, Plaintiff's treating neuropsychologist, submitted a statement expressing with a "high degree of certainty" that Plaintiff's cognitive disfunction began prior to December 2013. A.R. 330. Dr. Tennyson stated that she had reviewed the affidavits of Terp and Mitchell, and found that their accounts "were very specific and are consistent with early symptoms of dementia." *Id.* Also, Dr. Tennyson contended that Plaintiff had not been evaluated until 2015 because she had "little awareness of her deficits[,]" a common occurrence among individuals with dementia. *Id.* Also, Dr. Tennyson believed that Peer had not sought medical treatment for his wife because he had been "in denial" about her cognitive issues. *Id.*

### C. The ALJ's Findings

Following the hearing, the ALJ issued a written Decision on June 27, 2018, which applied a standard five-step process to determine that Plaintiff had not satisfied her burden of establishing disability. A.R. 17. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity between her alleged symptom onset date of June 15, 2009 and her date last insured of December 31, 2013. A.R. 19. Although Plaintiff continued to work for the joint business until its closure in 2014, Plaintiff stopped receiving wages or a salary in 2008, and the couple liquidated other assets for income. *Id.* Thus, in the ALJ's view, the Plaintiff's work for the joint business was not "substantial gainful activity." *Id.*

Second, the ALJ found that Plaintiff had the severe medically determinable impairment of "dementia/early-onset Alzheimer's Disease." *Id.* However, the ALJ ruled that Plaintiff's anxiety disorder and depression were not independent severe impairments, because Plaintiff had not sought

mental health care for these conditions, and because depression is a common complaint in the early stages of Alzheimer's Disease. A.R. 20.

Third, the ALJ found that Plaintiff did not have an impairment before the date last insured that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. A.R. 21. Program Operations Manual System (POMS) DI 23022.385 indicates that Early-Onset Alzheimer's Disease should be evaluated under listings 11.17 or 12.02, and the ALJ found that Plaintiff's impairment had not risen to the severity of either listing before December 31, 2013. *Id*. The ALJ determined that Plaintiff's impairment did not meet the criteria of listing 11.17 because Plaintiff's physical functioning was not limited in any marked capacity. *Id*. In that regard, the ALJ noted that Plaintiff could drive, perform personal care, cook, and do laundry through December 2016. *Id*. Also, the ALJ ruled that Plaintiff's mental impairments had not met or medically equaled the criteria of listing 12.02 prior to December 31, 2013. A.R. 22.

Also, as part of this step, the ALJ determined Plaintiff's residual functional capacity pursuant to 20 CFR 404.1520(e). *Id*. To make this determination, the ALJ reviewed the medical evidence and the testimonial record. A.R. 22-29. The ALJ did not assign significant weight to the testimony of Peer, Terp, or Mitchell because they were "not medically trained to make exacting observations as to the date, frequency, types and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms." A.R. 28. Furthermore, the ALJ assigned "partial weight" to the opinion of Dr. Tennyson because her diagnosis of dementia was not sufficient to find that Plaintiff was disabled. A.R. 27. The ALJ concluded that, through the date last insured, Plaintiff retained the residual functional capacity to perform work at all exertional levels with the following limitations: "the claimant can understand and remember simple one- or two-step instructions to carry out routine and repetitive tasks; can make only simple work-related

decisions based on established standards and instructions; can perform no tandem or team work with co-workers on the same task; and must work in occupations where there are few and infrequent changes in the work setting or the tasks performed." A.R. 22.

Fourth, the ALJ found that Plaintiff did not possess the residual functional capacity at the date last insured to perform the requirements of her past relevant work. A.R. 30.

Fifth and finally, after considering Plaintiff's residual functional capacity, age, education, and work experience, the ALJ found that "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed." *Id*. In reaching this determination, the ALJ relied on the testimony of a vocational expert who stated that Plaintiff would have been capable of performing the following occupations at the date last insured: (1) laborer, stores (DOT 922.687-058); (2) package sealer (DOT 920.685-074); and (3) airplane or bus cleaner (DOT 919.687-014), which the vocational expert testified existed in the national economy in the aggregate amount of 695,000 jobs. A.R. 31.

In conclusion, the ALJ found that Plaintiff was not disabled as of December 31, 2013 because she "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy[,]" and therefore denied Plaintiff's application for disability insurance benefits. *Id*.

## II.  <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); see *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are

deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

11

Eligibility for supplemental security income requires the same showing of disability. *Id*. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. at § 404.1520(a); see *Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." Id. A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a).

If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four that he or she has not retained the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and is not disabled. *Id.*

## III.   <u>ANALYSIS</u>

Plaintiff raises three arguments on appeal. First, Plaintiff argues that the ALJ disregarded relevant testimony and did not support her Decision with substantial medical evidence. Second, Plaintiff argues that the ALJ improperly relied on testimony regarding Plaintiff's continued ability to self-care and perform daily activities. Third, Plaintiff argues that the ALJ committed reversible error by failing to recognize that Plaintiff's claim was eligible for the SSA's Compassionate

Allowance program. For the reasons that follow, Plaintiff's second and third arguments do not justify vacating the ALJ's decision. However, the Decision will be vacated, and the case will be remanded for further consideration of the weight to be placed on the statements of Dr. Tennyson, Terp, and Michell.

> **A.     The ALJ Did Not Sufficiently Justify the Weight Assigned to Medical Evidence and Lay Testimony**

Plaintiff argues that the Decision must be vacated because the ALJ's determination that Plaintiff possessed residual functional capacity at the date last insured is unsupported by the medical evidence on record. Pl. Br. at 3. As a threshold matter, Plaintiff argues that the ALJ improperly relied upon flawed findings by state agency psychologists Dr. Umpierre and Dr. Foley. *Id*. at 4. Plaintiff argues that Dr. Umpierre's disability determination is not credible because it confusingly lists an unknown "Brendan Carlock" as the disability examiner and nonsensically states "Puerto Rico Puerto Rico" as the physical or medical specialist's name. *Id*.; *see* A.R. 103. Also, Plaintiff argues that Dr. Foley did not consider new evidence that Plaintiff submitted upon reconsideration. Pl. Br. at 4. Plaintiff argues that the state agency psychologists gave Plaintiff's medical review "very short shrift and should have been found totally inadequate." Pl. Br. at 4. However, regardless of the alleged deficiencies, the ALJ did not improperly rely upon the state agency psychologists' findings. In fact, the ALJ explicitly gave these findings "little weight[,]" and instead, chiefly based her Decision on other medical and testimonial evidence. A.R. 26. Therefore, the Court will not vacate the ALJ's Decision on this specific basis.

Plaintiff further argues that the ALJ improperly made a "negative inference" of non-disability in the absence of substantial evidence. Pl. Br. at 5-6.[1] Plaintiff argues that the medical

---

[1]     Plaintiff cites to *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 U.S. Dist. LEXIS 96128, at *27 (E.D. Mich. June 12, 2013), for the proposition that an ALJ's ruling cannot be based

opinion of Dr. Tennyson and the lay testimony of Terp and Mitchell demonstrate that Plaintiff's "total inability to function in the workplace" began well before 2013. Pl. Br. at 5. Also, Plaintiff notes that the ALJ did not question the credibility of any of these three witnesses. *Id*. In this connection, Plaintiff argues that the testimony of Terp, Mitchell, and Dr. Tennyson regarding Plaintiff's cognitive decline should have necessitated a finding of disability. *Id*. at 5-6. In response, Defendant argues that the ALJ was not obligated to accept the opinion of Dr. Tennyson, since the authority to make a residual functional capacity decision rests with the ALJ, not the claimant's physician. Def. Br. at 9. Moreover, Defendant argues that the testimony of Terp, Mitchell, and Dr. Tennyson does not conflict with the ALJ's ruling, because even if the onset of Plaintiff's symptoms had begun before the date last insured, the testimony does not prove that Plaintiff was incapable of gainful employment. *Id*. at 10.

20 CFR § 404.1546(c) specifies that the responsibility for assessing residual functional capacity at the hearing level lies with the ALJ. Accordingly, pursuant to 20 CFR § 404.1527(d)(2), an ALJ is not bound by the opinion of a physician when determining a claimant's residual functional capacity. The regulations provide that "[a]lthough [the ALJ] consider[s] opinions from medical sources on issues such as . . . your residual functional capacity . . . or the application of

---

on a "negative inference" in the absence of medical evidence. As an initial matter, Plaintiff's out-of-circuit authority is not binding on this Court. *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 246 (3d Cir. 2013) (explaining that out-of-circuit cases are not binding in this Circuit). Also, unlike in *Manson*, the ALJ here did not simply assume that Plaintiff was not disabled due to a lack of medical evidence. While some medical evidence shows that Plaintiff was severely cognitively impaired, other medical evidence suggests that Plaintiff had retained some capacity past 2013. As the ALJ notes, Alzheimer's Disease manifests itself in a "gradual cognitive decline," so evidence of functioning at a later date suggests that Plaintiff would have been capable of the same functioning at an earlier date. A.R. 26. In April 2015, sixteen months after the date last insured, Dr. Liebross only found Plaintiff to have "mildly impaired short-term memory." A.R. 24. In addition, the ALJ noted Dr. Pandya's report stating that Plaintiff "showed normal attention and concentration and did well on memory testing" in September 2015. A.R. 25.

vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner." *Id.* The Third Circuit, in *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011), similarly espoused that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."

However, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). When the opinion of a physician conflicts with other evidence, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Id.* (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)); *see also Brunson v. Comm'r of Soc. Sec.*, 704 F. App'x 56, 59 (3d Cir. 2017) ("[A]n ALJ may reject the opinion of a treating physician when it is unsupported and inconsistent with the other evidence on the record"). Also, "although [the ALJ] 'may properly accept some parts of the medical evidence and reject other parts,' [the ALJ] must 'provide some explanation for a rejection of probative evidence which would suggest a contrary disposition.'" *Nazario v. Comm'r Soc. Sec.*, 794 F. App'x 204, 209-10 (3d Cir. 2019) (quoting *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994)). An ALJ must consider all of the following factors when determining the weight to place on a treating physician's opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the treating source's specialization; and (6) any other relevant factors. 20 C.F.R. § 404.1527(c)(1)-(6) [2]; *see also* SSR 96-2p, 1996 SSR LEXIS 9. When an ALJ does not adequately explain his/her finding of the weight attributed to a treating physician's opinion, a

---

[2]   20 C.F.R. § 404.1527 only applies to claims filed before March 27, 2017. For claims filed on or after this date, the guidelines in § 404.1520c apply. Since Plaintiff applied for benefits on November 17, 2015, § 404.1527(c) is relevant to the ALJ's decision.

district court may remand the case to the Commissioner for further consideration. *See*, *e.g.*, *Boyer v. Saul*, No. 1:18-cv-14932, 2020 U.S. Dist. LEXIS 100519, at *24 (D.N.J. June 5, 2020).

Here, the ALJ did not properly explain why Dr. Tennyson's opinion was entitled to only "partial weight," when treating physicians' opinions are typically accorded greater weight. A.R. at 27. The ALJ stated that she accepted Dr. Tennyson's conclusion that Plaintiff experienced symptoms of dementia as early as 2009, but the ALJ did not place great weight on the opinion because, according to the ALJ, a diagnosis of the onset of dementia does not inherently guarantee benefits. *Id*. While a claimant is not entitled to benefits if he/she is diagnosed with a disability but able to sustain gainful employment, *see Facyson v. Barnhart*, 94 F. App'x 110, 113 (3d Cir. 2004), Dr. Tennyson's opinion suggests that Plaintiff may have been suffering from severe cognitive dysfunction and decline well before the date last insured. Indeed, the Decision is silent on the factors listed in 20 C.F.R. § 404.1527(c)(1)-(6), which are critical to consider before assigning weight to Dr. Tennyson's opinion. Without the ALJ's explanation, I have no basis to review the decision in this regard. I note that, at least some of the factors may suggest that Dr. Tennyson's opinion should be assigned greater weight. In particular, as to factor five, Dr. Tennyson is a clinical neuropsychologist with expertise in evaluating cognitive impairments such as Alzheimer's Disease. A.R. 337-39. Also, Dr. Tennyson's opinion is consistent with other evidence showing that symptoms of dementia and worsening of cognitive functions had appeared as early as 2009. A.R. 27. Furthermore, Dr. Tennyson performed numerous evaluations measuring Plaintiff's general intellectual functioning, attention, concentration, working memory, visuospatial functioning, language, communication, learning, executive functioning, high level reasoning, personality, and psychological state, which serve to suggest that Dr. Tennyson's opinion was sound. A.R. 334-337. While the ALJ retains the discretion to ultimately determine the weight

17

placed on a physician's opinion, the ALJ must provide an adequate explanation pursuant to 20 C.F.R. § 404.1527(c)(1)-(6), and none was provided. Therefore, this matter is remanded for further consideration of the weight to be accorded to the opinion of treating physician Dr. Tennyson, as well as a determination of Plaintiff's residual functional capacity based on the appropriately weighed medical evidence.

Along with relying on the opinions of physicians, an ALJ may also support a residual functional capacity decision with non-medical evidence. *Chandler*, 667 F.3d at 362. An ALJ "is not precluded from reaching RFC determinations without outside medical expert review of each fact incorporated into the decision." *Id.*; *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC"). If an ALJ rejects evidence from non-medical sources, he or she must provide specific reasons for doing so. *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014). An ALJ cannot "ignore uncontradicted relevant lay testimony where it corroborates the medical testimony of a treating physician and is consistent with the medical records." *Mancia v. Dir., Office of Workers' Comp. Programs, US DOL*, 130 F.3d 579, 588 (3d Cir. 1997). Also, "[l]ay testimony as to mental functioning cannot be deemed non-credible simply because contemporaneous medical corroboration is lacking." *Beasich v. Comm'r of Soc. Sec.*, 66 F. App'x 419, 430 (3d Cir. 2003). According to SSR 06-03p, 2006 SSR LEXIS 5, at *15, ALJs must determine the credibility of evidence from non-medical sources by considering "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *See Alvarez v. Comm'r of the SSA*, No. 10-890, 2011 U.S. Dist. LEXIS 70066, at *20 (D.N.J. June 28, 2011) (remanding a case

after the ALJ disregarded lay testimony without addressing the factors set forth in SSR 06-03p, 2006 SSR LEXIS 5).

Here, the ALJ has not sufficiently justified her refusal to give significant weight to the lay testimony of Terp and Mitchell. Although the ALJ did not call into question the credibility of their testimony, she did not find the witnesses persuasive because these individuals were "not medically trained to make exacting observations as to the date, frequency, types and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms." A.R. 29. However, this statement does not adequately provide a specific reason for not according their testimony significant weight, because, as in *Mancia*, the testimony here is consistent with later medical records and corroborates the medical testimony of a treating physician. In fact, Dr. Tennyson found that the testimonies offered by Terp and Mitchell were "very specific and are consistent with early symptoms of dementia." A.R. 330. Also, the ALJ did not sufficiently consider the factors listed in SSR 06-03p, 2006 SSR LEXIS 5, at *15, when assigning weight to the testimony from Terp and Mitchell, especially concerning the nature and extent of their relationships with Plaintiff. Terp worked with Plaintiff from 2001 to 2009, well before the date last insured, and her testimony, vis-à-vis Plaintiff's cognitive and memory abilities, directly relates to Plaintiff's inability to work. A.R. 76-79. Mitchell also interacted with Plaintiff during the pertinent period before the date last insured, from 2010 through 2013, and she knew Plaintiff in both a personal and professional capacity as Plaintiff's friend and paralegal. A.R. 225. In light of these facts, since the ALJ has not adequately stated why the testimony of Terp and Mitchell should not be given significant weight in accordance with SSR 06-03p, 2006 SSR LEXIS 5, remand is also appropriate on this basis.

Finally, while an ALJ's failure to adequately justify the weight assigned to lay statements is legal error, some courts have refused to remand cases where the disregarded testimony was

cumulative of other evidence and would not have changed the outcome of the case. *See*, *e.g.*, *Lopez v. Comm'r of Soc. Sec.*, No. 15-3759, 2016 U.S. Dist. LEXIS 179023, at \*39 (D.N.J. Dec. 27, 2016); *Buffington v. Comm'r of the SSA*, No. 12-100 (JBS), 2013 U.S. Dist. LEXIS 29860, at \*27 (D.N.J. Mar. 4, 2013). However, the testimony provided by Terp and Mitchell is not cumulative of other evidence and could potentially affect the outcome of Plaintiff's claim. Only Terp testified about the great difficulty Plaintiff had learning new administrative tasks between 2007 and 2009. A.R. 79. Additionally, her testimony may be at odds with the ALJ's residual functional capacity determination that Plaintiff could make "simple work-related decisions based on established standards and instructions." A.R. 22. Terp testified that she wrote step by step instructions, but that Plaintiff had remained unable to follow them and learn her new tasks by the time Terp left the company in 2009. A.R. 81. Additionally, Mitchell's statement contains accounts of Plaintiff's cognitive difficulties that do not appear elsewhere in the record. For instance, prior to 2013, Mitchell noted that Plaintiff had forgotten that she signed a foreclosure document and could not remember what she had said or whether she had eaten within a short period of time. A.R. 225. This testimony is at odds with the RFC's determination that Plaintiff could remember instructions for routine tasks through 2013. Therefore, the Decision's lack of sufficient explanation for the weight placed on Terp's and Mitchell's testimony is not simply harmless error. As discussed, *supra*, the Court may not substitute its conclusions for those of the ALJ, but the ALJ must nevertheless provide a sufficient explanation for placing limited weight on potentially probative evidence. Consequently, the case is remanded to the Commissioner to reconsider the weight to be placed on the testimony of Dr. Tennyson, Terp, and Mitchell, and to reassess Plaintiff's residual functional capacity based on the appropriately weighed evidence.

**B.     The ALJ Properly Analyzed the Evidence Regarding Plaintiff's Daily Activities and Self-Care Testimony**

Plaintiff argues that the Decision must be vacated because it was improper for the ALJ to consider Peer's testimony about Plaintiff's continued ability to self-care and perform daily activities. Pl. Br. at 7. Plaintiff argues that an ALJ cannot use this category of evidence to show that a claimant is not disabled. *Id*. In addition, Plaintiff argues that Peer's testimony was unreliable and not reflective of her deteriorating condition. *Id*.[3] In response, Defendant argues that the ALJ properly considered this testimony as one factor among many supporting the denial of disability benefits. Def. Br. at 12.

Plaintiff has not offered any precedential authority in support of her argument that an ALJ cannot consider evidence of a claimant's ability to self-care and perform daily activities. Rather, Plaintiff quotes from *New Mental Impairment Listing Issued*, Disability Law News, Oct. 2016, at 2: "A complete picture of daily activities should be considered, with the recognition that the ability to perform some routine activities without help and support does not mean that you do not have a mental disorder or that you are not disabled." (internal quotations omitted). Yet, in *Grogan v. Comm'r of Soc. Sec.*, 459 F. App'x 132, 138 (3d Cir. 2012), the Third Circuit found that an ALJ's denial of disability benefits was supported by the claimant's ability to perform daily activities "such as making simple meals, caring for her children, paying bills, and light cleaning" and the claimant's capacity for "proper self-care and grooming." *See also Cruz v. Colvin*, No. 15-1639,

---

[3]     Plaintiff also argues in this section that an ALJ must consider the diagnosis of a severe impairment after the date last insured as evidence that the claimant suffered from the same impairment before the date last insured. Pl. Br. at 7-8. This argument is without merit. Besides the obvious fact that an impairment may both develop and be diagnosed after the date last insured, an ALJ need not presume that a severe mental impairment diagnosed after the date last insured also existed beforehand. At the hearing level, the burden rests on the claimant to establish the onset of a severe impairment. *Kushner v. Comm'r Soc. Sec.*, 765 F. App'x 825, 829 (3d Cir. 2019).

2016 U.S. Dist. LEXIS 36014, at *36 (D.N.J. Mar. 21, 2016) (finding that a claimant's ability to "care for herself, engage in leisure activities, manage her health and personal care needs, and use community resources" counted as relevant evidence supporting an ALJ's decision to deny disability benefits). Also, the credibility of subjective testimony regarding issues such as a claimant's ability to perform daily tasks is a determination generally left to the ALJ. *See Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007) (stating that an ALJ's credibility determination should only be rejected in an "extraordinary case"); *Arreizaga v. Berryhill*, No. 17-10631, 2019 U.S. Dist. LEXIS 27881, at *18 (D.N.J. Feb. 20, 2019) (stating that an ALJ's credibility determinations are entitled to great deference).

Here, the ALJ did not err by relying on Peer's testimony about Plaintiff's ability to perform daily activities and self-care. Contrary to Plaintiff's argument, this type of evidence has probative value in determining a claimant's residual functional capacity. In fact, the cited excerpt from Disability Law News does not establish that evidence of daily activities cannot be used in a decision denying disability benefits. Instead, the excerpt only states that a claimant's ability to perform routine activities does not inherently defeat a disability claim. Moreover, Plaintiff does not highlight any extraordinary circumstances that would justify rejecting the ALJ's reliance on Peer's testimony. In fact, the ALJ, while relying on Peer's testimony, chose not to give "significant weight" to his statements regarding Plaintiff's activities such as cooking, shopping, and socializing. A.R. 28. The ALJ recognized that Peer's testimony was not determinative because he was "not medically trained to make exacting observations," and because he had not accurately recorded the course of Plaintiff's symptoms. A.R. 28-29. Therefore, the ALJ did not inappropriately rely on Peer's testimony about Plaintiff's ability to perform daily activities and self-care.

### C.  The Compassionate Allowance Program Would Not Have Altered the ALJ's Decision

Lastly, Plaintiff argues that the ALJ committed reversible error by failing to hear Plaintiff's case in accordance with the Social Security Administration (SSA)'s Compassionate Allowance (CAL) system, which provides an expedited process for claimants with critical illnesses. Pl. Br. at 8-9. Defendant responds that the lack of CAL treatment was, at worst, harmless error, because having a qualifying impairment does not guarantee a claimant disability benefits or change the analytical framework at the hearing level. Def. Br. at 12-13. Therefore, Defendant argues that benefits would have been denied even if the CAL process had been followed. Def. Br. at 13.

The SSA instituted the CAL to provide an "expedited process" to evaluate certain claims requiring minimal objective medical evidence. 20 CFR § 404.1602. "Critical cases" that qualify for CAL treatment may be identified both at the initial level or at later stages of review. Hearing Appeals and Litigation Law Manual (HALLEX) § I-2-1-40.[4] "Subsequent identification, including at the hearing level, may be based solely on a claimant's allegation or on new medical evidence of a condition included on the CAL list of impairments." *Id*. The purpose of this expedited process is to "allow the [SSA] to target quickly the most obviously disabled individuals for allowances based on objective medical information that [the SSA] can obtain quickly." *Id*. The SSA has placed Early-Onset Alzheimer's Disease on the list of medical conditions to which the CAL applies. POMS DI 23022.385.[5] This categorization permits a simplified assessment to be administered based on clinical records, a report of daily living completed by a relative or caregiver, and documentation of standardized testing. *Id*. However, an adjudicator may also use the complete

---

[4]    HALLEX § I-2-1-40 can be viewed at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-40.html (last visited July 24, 2020).

[5]    POMS    DI    23022.385    can    be    viewed    at https://secure.ssa.gov/apps10/poms.nsf/lnx/0423022385 (last visited July 24, 2020).

record of medical evidence at his or her discretion. *Id.* Additionally, an Early-Onset Alzheimer's Disease diagnosis does not guarantee a disability benefits claim under the CAL, because "the decision to allow or deny the claim rests with the adjudicator." *Id.*

Whether an ALJ's failure to resolve a CAL claim on an expedited basis constitutes reversible error is a question of first impression in this Circuit. However, courts in other circuits have consistently ruled that such failure does not warrant reversal. *See*, *e.g.*, *Doto v. Berryhill*, No. 17-01120, 2018 U.S. Dist. LEXIS 168347, at *45 (N.D. Cal. Sept. 28, 2018) ("[I]nsofar as [the claimant] argues that the compassionate allowance program mandates a finding of disability, the Court finds no basis for that contention."); *Yaws v. Berryhill*, No. 15-0961, 2017 U.S. Dist. LEXIS 38124, at *18 (N.D. Tex. Feb. 23, 2017) ("CAL provides a means to expedite a case but does not alter the manner in which adjudicators decide disability[,]" and so "to the extent an ALJ errs in failing to identify a case as a CAL case, such failure does not warrant reversal absent prejudice to the claimant."); *Hall v. Colvin*, No. 1:12-CV-00347-REB, 2013 U.S. Dist. LEXIS 127684, at *15 (D. Idaho Sept. 4, 2013) (affirming a denial of disability benefits because "the placement of [the claimant's impairment] on the compassionate allowances list does not dictate a finding of disability and the ALJ properly assessed his condition."); *Webb v. Colvin*, No. 3:12-CV-1059-O, 2013 U.S. Dist. LEXIS 132084, at *53 (N.D. Tex. Aug. 27, 2013) ("Because the ALJ would have reached the same disability determination if he had identified Plaintiff's case as a CAL case, his error does not warrant reversal.").

While the ALJ did not exercise her discretion to treat Plaintiff's claim through the expedited CAL process, Plaintiff has not demonstrated that the Decision must be reversed on this basis. In fact, Plaintiff has offered no arguments why the failure to consider the CAL process would have prejudiced her claim, or that the result could have been different. Even if the ALJ had treated

Plaintiff's claim as a CAL case, the ALJ, nevertheless, retained the discretion to consider Plaintiff's complete medical record in her decision to either grant or deny disability benefits. In any event, because the CAL program was intended to quickly identify critical cases from the outset that deserved expedited treatment, this is not an issue to be reconsidered upon remand. Indeed, HALLEX § I-2-1-40 states that subsequent identification of a CAL case must be related to a *new* medical condition subject to CAL; Plaintiff's Early-Onset Alzheimer's Disease was known to the SSA from her initial application.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Court will **REMAND** this matter to the Commissioner for further consideration consistent with this Opinion. An appropriate Order shall follow.


DATED: August 3, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge